John D. Fiero (CA Bar No. 136557)
PACHULSKI STANG ZIEHL & JONES LLP
One Sansome Street, 34th Floor, Suite 3430
San Francisco, CA  94104
Telephone:   (415) 263-7000
Facsimile:   (415) 263-7010
E-mail:  jfiero@pszjlaw.com

Attorneys for Michael Goldberg,
Trustee of the PFI Trust

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PROFESSIONAL FINANCIAL INVESTORS, INC., *et al.*,<br><br>Debtor. | Case No. 20-30604<br>(Jointly Administered)<br><br>Chapter 11 |
| Michael Goldberg, Trustee of the PFI Trust,<br><br>Plaintiff,<br><br>v.<br><br>Leslie Michelle Wallach, Manuel A. Romero, and Charlene Albanese,<br><br>Defendants. | Adv. Proc. No. 24-03034<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES FOR BREACH OF FIDUCIARY DUTY, AND TO EQUITABLY SUBORDINATE CLAIMS PURSUANT TO 11 U.S.C. § 510(C)(1)** |

Michael Goldberg, the duly appointed Trustee ("*Trustee*" or "*Plaintiff*") of the PFI Trust (the "*Trust*") arising from the above-captioned chapter 11 case of Professional Financial Investors, Inc. and Professional Investors Security Fund ("*PISF*") and their affiliated debtors (collectively, "*PFI*" or the "*Debtor*"), as and for his first amended complaint ("*Complaint*") against the above-captioned defendants, Leslie Michelle Wallach ("*Defendant Wallach*"), Manuel A. Romero ("*Defendant Romero*"), and Charlene Albanese ("*Defendant Albanese*") (collectively, the "*Defendants*"), by his undersigned counsel, alleges as follows:

//

//

# I.

# INTRODUCTION

1. By this action, the Trustee—standing in the shoes of PFI and its defrauded investors by virtue of the *Modified Second Amended Joint Plan of Professional Financial Investors, Inc. and Its Affiliated Debtors Proposed by the Debtors and Official Committee of Unsecured Creditors and Supported by the Ad Hoc LLC Members Committee and the Ad Hoc DOT noteholders Committee Dated (May 20, 2021*) - seeks to recover amounts lost by Professional Financial Investors, Inc. ("**PFI**") in a long-running Ponzi scheme, along with other amounts legally due and owing as a result of the Defendants' neglect and malfeasance. Additionally, Plaintiff seeks to hold Defendants accountable for their malfeasance and neglect in failing for years to check the dangerous (and often obvious) criminal impulses of Ken Casey and Lewis Wallach, as more particularly described below.

2. PFI and its affiliate PISF were two branches of the Professional Financial Investors enterprise that employed each of the Defendants in Novato, California. The companies were founded as real estate investment and management firms specializing in multi-unit residential and commercial properties in Northern California. Specifically, on or about November 1, 1983, Kenneth Casey founded PISF and served as its sole shareholder, officer, and director from that date until his death on May 6, 2020. On or about August 15, 1990, Mr. Casey also founded PFI and served as its sole officer, director, and shareholder until 1998, when he relinquished his corporate positions, and the Michael Angelo Albanese Family Irrevocable Trust (the "***Albanese Trust***") became the sole shareholder of PFI. Defendant Albanese is the trustee of the Albanese Trust.

3. In 1990, PFI hired Lewis Wallach as a bookkeeper who later took over as president of PFI in 1998. Mr. Wallach continued to serve as president of PFI until June 2020, when the extent of the fraud outlined below was made clear and he was asked to resign. Wallach left PFI at or about the same time and is now serving a lengthy sentence in federal prison.

4. On October 20, 2004, Defendant Albanese became the sole director of PFI pursuant to a shareholder resolution bearing her signature. Defendant Albanese also held officer positions inside PFI from time to time, including the position of Vice President.

5. Defendant Romero joined PFI as an accountant in 2006 and became controller in 2015. He was appointed Chief Financial Officer in 2018, the position he held until his termination in June 2020. Romero has never been licensed as a CPA but holds a two-year accounting degree issued by an educational institution in Nicaragua.

6. Defendant Leslie Wallach was an executive with a significant accounting background who began working at PFI in 2002 and who for many years held the titles of Vice-President and Treasurer. Later, she took on the additional title of Director of Finance before becoming PFI's Chief Administrative Officer for the remainder of her tenure. In those roles, Defendant Wallach's responsibilities included but were not limited to working with the very investors who became victims of the Ponzi scheme. Defendant Wallach was so important to the organization that, in her final full year of employment (2019), her compensation exceeded $200,000. Significantly, in the PFI administrative hierarchy, Defendant Romero (the CFO) reported to Defendant Wallach.

## II.

## JURISDICTION AND VENUE

7. Each of the Defendants is an individual residing in Marin County, California. Each of the acts and failures to act alleged herein similarly occurred in Marin County, California.

8. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

9. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (C), and (O).

10. This adversary proceeding is brought pursuant to 11 U.S.C. §§ 502, 510 and Rules 3007(b) and 7001 of the Federal Rules of Bankruptcy Procedure.

11. Venue lies in the United States Bankruptcy Court, Northern District of California, San Francisco Division, pursuant to 28 U.S.C. § 1409(a).

12. In compliance with Local Bankruptcy Rule 7008-1, Plaintiff consents to entry of a final order or judgment by the Bankruptcy Court.

### III.

### **GENERAL FACTUAL ALLEGATIONS**

13. For several decades, PFI offered investors what appeared to be safe, steady returns backed by Marin and Sonoma County real estate. When Casey died suddenly in May 2020, however, it quickly became apparent that their investment business, Professional Financial Investors (PFI), was actually a long-running Ponzi scheme that cost investors hundreds of millions of dollars.

14. There was nothing particularly clever or original about Casey and Wallach's Ponzi scheme. It would have been obvious to anyone with access to PFI's financials (including each of the Defendants). PFI was raising hundreds of millions of dollars from mostly local mom-and-pop investors by promising returns that income from the properties couldn't cover. To make the promised interest payments and fund their lavish lifestyles, Casey and Wallach were depositing money from new investors into company accounts and then using those funds to pay previous investors and for their personal benefit.

15. The Ponzi scheme was so obvious that within a month of Casey's death, the scheme was publicly exposed, the SEC had opened an investigation, and PFI had suspended monthly payments to existing investors. The above-captioned bankruptcy case ensued.

16. The roles played by each of the Defendants inside PFI should have given them a clear view of PFI's situation. As CFO, Romero was in charge of PFI's bank accounts; he was responsible for insuring that monies were not commingled and that none of the accounts were overdrawn. Moreover, Romero knew PFI and PSF had raised hundreds of millions of dollars from more than 1,300 investors through the offer and sale of securities. While soliciting those investments, Casey and Wallach made numerous false and misleading statements. Indeed, new investors were led to believe that their investments were liquid and could be cashed out at any time with as little as a few days' notice because PFI and PISF supposedly maintained substantial reserves for that purpose. Based on his officer's position and familiarity with the true state of

affairs, Romero should have known those statements were false and should have taken action to stop investors from relying upon them. Defendant Albanese was similarly on notice and responsible for the Ponzi scheme. As the sole shareholder and only board member of PFI, she had (or should have had) a clear understanding of the source of the more than $1 million worth of cash and gold bars found in a home she shared with Casey. Moreover, she was personally aware of the acute personal spending of PFI money that she and Casey invested in the upkeep and remodeling of their residences. Plaintiff is informed and believes, and on that basis alleges that such spending exceeded $4 million. Finally, Defendant Albanese was both the 100% shareholder of PFI and also its sole director. Had she acted in a reasonably prudent fashion instead of her grossly negligent one, she would have insisted upon annual board meetings, standard corporate formalities, and annual audits by a qualified certified public accounting firm. Plaintiff is informed and believes, and on that basis alleges that any combination of such measures would likely have uncovered resulted in the stoppage of the Ponzi scheme. However, Defendant Albanese took none of those measures, evidently preferring instead to enjoin the pecuniary benefits of being Ken Casey's significant other.

17. Ultimately, PFI and PISF orchestrated the purchase of no fewer than seventy properties over the years. These properties were owned by LLCs (with PFI as the managing member), by limited partnerships (with PFI as the general partner), or by PFI itself (with investors as tenants in common). For each real estate purchase, PFI set up a separate bank account where investor funds raised for that particular real estate investment should have been segregated from other investments and from PFI and PISF's corporate funds.

18. PFI and PISF also each maintained a general corporate account for company money. Each company also maintained at least one clearing account: PFI maintained one clearing account, titled "PFI Clearing," and PISF maintained two clearing accounts, titled "PISF Clearing" and "PISF Transfer." The clearing accounts were the primary vehicle used to defraud investors and keep the PFI Ponzi scheme running. Plaintiff is informed and believes, and on that basis alleges that that Defendants Wallach and Romero had full, regular, and continuous visibility into such accounts due to their high position in the company and access to the online banking and

internal accounting systems. Further, had she chosen to exercise her actual authority and responsibility, Defendant Albanese could also have had such access.

19. Clearing accounts are pass-through accounts that are designed to temporarily hold funds before they are transferred to a more permanent location. They should carry a balance only when funds need to be transferred somewhere else and return to a zero balance once those funds are cleared out, which should typically happen on a daily basis. Clearing accounts are often used by businesses to simplify routine banking transactions. In the case of an investment company like PFI, clearing accounts were used to receive investor wires or checks, which were then supposed to be rerouted to the appropriate investment account.

20. PFI sometimes cleared new investor money out of its clearing accounts as expected. If an investor wired a $100,000 investment into a PFI clearing account, PFI (and Defendants Wallach and Romero) might then transfer the exact same amount into the appropriate investment account. But on many occasions, when new investor funds were deposited into a clearing account, PFI (and Defendants Wallach and Romero) would let them sit in the clearing account indefinitely, commingling those funds with other new investor funds, and eventually using that money for an illicit purpose. Such funds might end up funding payments to existing investors (which were sometimes made by issuing a wire or check directly to investors and sometimes through a payroll processing company that PFI and Defendant oddly used to distribute funds back out) or the funds might be used to cover shortages in a variety of other accounts, including shortages in other clearing accounts or in PFI's general accounts. Or they might be used to fund transfers to Casey's and Wallach's personal bank accounts.

21. As mentioned above, although PFI's assets were real estate and thus notoriously illiquid for short-term purposes, PFI maintained a liberal withdrawal policy that allowed investors to seek a return of some or all of their invested funds on little notice and for little reason. Plaintiff is informed and believes, and on that basis alleges that each of the Defendants were fully aware of this policy and that Defendants Wallach and Romero were regularly involved in returning investor funds upon request. Plaintiff is informed and believes, and based thereon alleges that Defendants knew or should have known that the only way a business with PFI's financial model could create

the illusion of flexible liquidity for investors was by allowing improper commingling, ignoring ordinary protections that would have ensured that new investor funds were deposited as the investor intended and that prevented those same funds from being paid out to old investors.

22. As PFI's Director of Finance and later as PFI's Chief Administrative Officer and Manuel Romero's superior, Defendant Wallach was further on notice that PFI's handling of its bank accounts was far less than perfect. Indeed, she received and sent dozens of emails regarding the overdraft situations PFI often found itself in because it was operated as a Ponzi scheme and not as a legitimate business. She also knew about the (highly improper) movement of money between properties and accounts that happened with regularity. As a result of her knowledge, the emails, and her daily interaction with Ken Casey, her brother Lewis Wallach, and Defendant Romero, Plaintiff is informed and believes, and on that basis alleges that Defendant Wallach knew or should have known that PFI was not a legitimate business and was, instead, a vicious Ponzi scheme. Plaintiff is informed and believes, and on that basis alleges that Defendants Romero and Albanese should similarly have known the true state of affairs and caused the Ponzi scheme to stop had they not acted in a grossly negligent fashion in breach of their fiduciary duties.

23. It was common practice at PFI for Ken Casey and Defendant Wallach's brother Lewis to divert PFI assets to their own purposes. Just two examples include Lewis's multi-million investment in Texas real estate using money taken from the company and Ken Casey's regular use of PFI staff and personnel to improve real estate he owned personally. Plaintiff is informed and believes, and on that basis alleges that Defendants were aware of such activities but never sought to further investigate or stop them.

24. As experienced accountants, Defendants Wallach and Romero knew that multi-family and commercial real estate projects commonly maintained reserve funds to account for wear, weathering, age, and replacement of physical assets. However, PFI's properties did not maintain such reserves because to have done so would have limited the Ponzi scheme's ability to perpetuate itself. Plaintiff is informed and believes, and on that basis alleges that Defendants Wallach and Romero knew PFI's properties did not maintain appropriate reserves, or reserves at all in many instances.

25. Another highly unusual practice at PFI was its acceptance and retention of large amounts of cash representing what were supposed to be investor funds. Defendants Wallach and Romero knew that PFI maintained a safe for the purpose of accepting and storing cash. Indeed, they knew about the safe and on occasion helped in the counting of cash placed therein.

26. As director of finance and later as chief administrative officer, Defendant Wallach was Manuel Romero's superior. Plaintiff is informed and believes, and on that basis alleges that Defendant Wallach was fully aware of PFI's regular overdrafts and improper moving of monies between accounts as manipulated by Romero and her brother. However, Defendant Wallach never made any effort to stop or correct these practices.

27. Defendant Wallach has filed two proofs of claim in the above-captioned bankruptcy case, claim numbers INV-50 and INV-54, which are clearly duplicates; each such claim asserts a total net claim of $583,675.42 and a total restitution claim of $612,859.19 (the "**Wallach Claims**"). Defendant Albanese has filed proof of claim number INV-46 in the above-captioned bankruptcy case in which she alleges entitlement to total net claim of $728,016.94 and a total restitution claim of $764,417.79 (the "**Albanese Claim**" and, collectively with the Wallach Claims, the "**Claims**").

IV.

## FIRST CLAIM FOR RELIEF – BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS

28. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 27 above, as if fully set forth herein.

29. As high-level officers and/or the director of PFI, Defendants owed a fiduciary duty of care to PFI.

30. Defendants were grossly negligent and breached their fiduciary duty of care by failing to act upon her knowledge of the above-described facts or make any effort to stop the Ponzi scheme at any time.

31. Had Defendants acted as responsible and prudent corporate executives, they would have either resigned or taken steps to correct the faulty practices described above. They did not—ever.

32. As a direct and proximate result of Defendants' actions and inactions, PFI ended up with properties it could not fund and investors it could not repay. As a direct consequence of the foregoing predicament, PFI was damaged in an amount no less than $100 million.

## V.

## SECOND CLAIM FOR RELIEF – FOR EQUITABLE SUBORDINATION OF THE OF CLAIM OF DEFENDANTS WALLACH AND ALBANESE

33. Plaintiff realleges and incorporates the allegations set forth in paragraphs 1 through 32 above, as if fully set forth herein.

34. The conduct of Defendants Albanese and Wallach, as alleged above, constitutes inequitable conduct.

35. By reason of such conduct, the Debtor's general unsecured creditors were harmed.

36. Allowing Defendants Wallach or Albanese to receive payment on the Claims prior to the Debtor's general unsecured creditors would be unfair and inequitable.

37. Equitable subordination of the Claims is consistent with the Bankruptcy Code.

38. This Court has the requisite equitable power pursuant to section 510(c)(1) of the Bankruptcy Code. Because of the facts and circumstances described in the preceding paragraphs of this Complaint, the Claims should be equitably subordinated to all of the allowed claims of the Debtors' general unsecured creditors.

## VI.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests relief as follows:

1. For a judgment against each Defendant in an amount to be proven at trial, but not less than $100,000,000.00.

//

//

2. For a judgment equitably subordinating the Wallach Claims and the Albanese Claim so that nothing is paid to such Defendants from the bankruptcy estate until all other allowed general unsecured claims have been paid in full.

3. For costs of suit.

4. For such other and further relief as is just and proper.

Dated: February 21, 2025   PACHULSKI STANG ZIEHL & JONES LLP

By  /s/ John D. Fiero
John D. Fiero

*Attorneys for Michael Goldberg,
Trustee of the PFI Trust*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA